**Robert C. McLEAN**

v.

**UNITED STATES of America, United States Department of the Navy.**

**Civ. A. No. 75–3579.**

United States District Court,
E. D. Louisiana.

Jan. 18, 1977.

Eldon E. Fallon, Kierr, Gainsburgh, Benjamin, Fallon & Lewis, New Orleans, La., Malcolm A. Coco, Jr., Metairie, La., for plaintiff.

Clayton G. Ramsey, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for defendant.

Fred E. Salley, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for intervenor, Avondale Shipyards, Inc.

## MEMORANDUM AND ORDER

R. BLAKE WEST, District Judge.

This matter came before the Court for trial on January 6, 1977.

The issues of liability and damages were bifurcated, and, at the conclusion of the presentation of all the evidence relating to liability, the Court, for the reasons stated herein, ruled in favor of the plaintiff.

Following the Court's ruling, the matter of quantum was tried to the Court, and, for the reasons contained in this opinion, the Court holds that the plaintiff is entitled to an award in the sum of One Million Two

Hundred and Two Thousand Eight Hundred and Eighty and 56/100 ($1,202,880.56) Dollars.

## THE LIABILITY OF THE DEFENDANT

On February 27, 1975, the plaintiff sustained the injuries for which he sought compensation while in the course of his duties as an insulator at Avondale Shipyards.

Avondale, at that time, was under contract with the Navy Department to perform certain repairs aboard the destroyer, USS WILLIAM C. LAWE. The LAWE contains what is known as a redundant fueling system. That is, the vessel contains twin Engine Rooms and twin Fire Rooms which can be connected in any combination of ways so as to maintain power in the event one element is rendered inoperative.

At the time of the injury, the plaintiff was working in what is known as Fire Room No. 1.

The machinery in Fire Room No. 1 was being worked on and was inoperative. A portion of the auxiliary feed pump had been removed and a wooden plug placed in the aperture left by the removal. The purpose of the plug was to keep debris and equipment from entering the opening, not to restrain hot water and/or steam from coming out, because this system was supposed to be free from any steam and/or hot water.

Some time prior to the accident, it was decided by Navy personnel to "light-off" the boilers in Fire Room No. 2 and utilize the steam thereby generated to test the equipment in Engine Room No. 1. The Navy had exclusive control over the "lighting-off" process, and, during the operation, Navy personnel retained the authority to open and close the valves which sent steam and/or hot water to the machinery to be tested.

The main hot suction valve which controlled the flow of hot water and/or steam to Fire Room No. 1's auxiliary feed pump was located in No. 1 Engine Room, which engine room is immediately aft of Fire Room No. 1, separated by a steel bulkhead.

Navy supervisors instructed their subordinates to send hot suction to the No. 2 Fire Room. In attempting to carry out this order, the wrong valve was opened by Navy personnel and hot suction was sent instead to the No. 1 Fire Room which was forward of the No. 1 Engine Room.

In this manner, steam and/or hot suction was released into the piping leading to the No. 1 auxiliary feed pump, the plug was blown out, and steam and/or hot water under pressure sprayed on the plaintiff, who was performing work in the No. 1 Fire Room near the auxiliary feed pump.

The Court reached this conclusion based on the testimony presented. Specifically, the testimony of Mr. DeCuir, a machinist's mate 2nd class, who was in charge of Engine Room No. 1, indicates that it was common knowledge that both Avondale and Navy personnel were working in Fire Room No. 1 and Mr. DeCuir felt the "lighting-off" process was dangerous. Mr. DeCuir conveyed this to his immediate supervisor, Senior Chief Jackson.

Mr. Zegarlowicz, who was working under Mr. DeCuir's supervision, testified that he had been told to open a valve and he did so. Although Mr. Zegarlowicz maintained that he opened a valve in the line leading to the No. 2 Fire Room, the evidence sustains the position that Mr. Zegarlowicz was not familiar with Engine Room No. 1, his duty station being Engine Room No. 2, and that the valves were not in any way color-coded or wired, as they should have been. The conclusion is inescapable that Mr. Zegarlowicz in fact opened the valve in the line to Fire Room No. 1, where Plaintiff was working.

Mr. Zegarlowicz further testified that he had left the valve open for approximately ten minutes and was then instructed to close it.

The government contended at trial that the plaintiff was not injured as a result of an erroneously open valve but rather as a result of a leak in the main hot suction valve which, after considerable build-up, caused the water to be expelled.

The Court cannot accept the government's contention for two basic reasons. First, it was testified at trial that in order for the accident to be the result of a leak, water would have had to build up in the line, if this was the case, the plaintiff and his fellow workers would have been sprayed with cold water initially. All three testified that the water came out of the line hot.

Second, at no time prior nor subsequent to the accident was Avondale called upon to do any work upon the main hot suction valve, and, accordingly, the Court cannot conclude that a leak which was never noticed or repaired, was the cause of the injury.

The government further contended that the injury would not have occurred if Avondale had placed a steel flange over the auxiliary feed pump, rather than the wooden plug. The Court is not persuaded by this argument, since it was the testimony of all the Avondale people, some of whom are experts in the field, that the use of a wooden plug constituted a normal and safe procedure under the circumstances. It certainly was not contemplated by Avondale that the Navy would open the wrong valve, and, it not being reasonably foreseeable, Avondale was under no obligation to take steps to prevent the occurrence of injury.

For the foregoing reasons, the Court found that the accident was caused by the Navy's negligent opening of the main hot suction valve in Engine Room No. 1 and that Plaintiff was severely burned by steam and/or hot water forcefully ejected from the aperture in the pump in Fire Room No. 1, which in turn was caused by the negligence of Navy personnel in opening the valve in Engine Room No. 1 which permitted the steam and/or hot water to enter Plaintiff's working area. Plaintiff's injury was proximately caused by the negligence of Defendant. Plaintiff was in no way contributorily negligent.

## THE ISSUE OF DAMAGES

As a result of being sprayed with steam and/or hot water, Plaintiff sustained burns over sixty to sixty-five percent of his body. Furthermore, as a direct result of his injuries, the plaintiff developed a fungal infection of the brain. This infection necessitated at least three surgical procedures during which portions of the plaintiff's skull and brain were excised. As a result of these injuries the plaintiff has been left with partial paralysis of the upper and lower extremities on the left side of his body and is subject to epileptic seizures and suffers physical, psychological and psychiatric disabilities.

At the time of his injuries the plaintiff, Robert C. McLean, was thirty years of age and was residing with his three minor children.

The Court heard the testimony of two physical therapists relating to the treatment of burns and the testimony of Dr. Richard Coulon, a neurosurgeon who operated on the plaintiff. The Court also heard the testimony of Dr. Mabey relating to the treatment of burns and the resultant trauma, as well as the testimony of Doctors Feldman and Davis relating to the extent of the plaintiff's psychological injuries. The government presented the testimony of Dr. Clay of the Public Health Service relative to the plaintiff's disability and his rehabilitative prospects.

Without belaboring the point, the Court finds that the plaintiff has suffered grievous injuries and permanent disabilities as a direct result of the injuries he sustained on February 27, 1975.

Accordingly, the plaintiff is entitled to an award of general damages for his past, present, and future mental and physical pain and suffering and disfigurement. The plaintiff entered Ochsner Foundation Hospital on February 27, 1975, and was eventually discharged on June 28, 1975. During his inpatient treatment at Ochsner, the plaintiff received extensive care for his burns which involved over sixty percent of his body. The treatment for the burns consisted of debridement, a painful process in which the skin is removed from the body while the patient is awake and situated in a whirlpool-type tank. The plaintiff devel-

oped a fungal infection secondary to his burns. The fungal infection invaded his brain and he was required to undergo three operations on his skull and brain. A portion of the frontal lobe of his brain was removed together with a large portion of his skull. Although the hair does to some extent hide the crater left by the removal of the skull, it can be seen and is a tragically disfiguring annoyance to the plaintiff. Moreover, the burned areas of his body are covered with unsightly and uncomfortable scars. Finally, the plaintiff's fungal infection and resulting brain damage has left him with partial paralysis of the left upper and lower extremities, as well as Jacksonian and grand mal epilepsy.

Since his injury, the plaintiff has received extensive medical treatment and is presently receiving psychiatric care. He is required to take anti-convulsant medication in an attempt to control his seizures and will continue to require this medication for the rest of his life. He has made an effort to rehabilitate himself by entering Delgado Trade School; but, although he should be lauded for these attempts, the Court does not feel it reasonable to believe he will be able to compete on the open job market, given his limited skill, education and his severe injuries and residuals. The plaintiff's relationship with his children has been drastically affected. He is now cared for by his mother much the same as she cares for his minor children. There is evidence to indicate that the plaintiff has difficulty dressing himself and must be encouraged to maintain personal hygiene and acceptable bodily appearance. His activities and enjoyment of life are very severely limited. To a very real degree, Plaintiff's future has been ruined.

Although there is no yardstick by which Plaintiff's damages may be measured, the Court has concluded that an award of $60,000 for pain and suffering during the four months while the plaintiff was being treated in Ochsner Foundation Hospital is proper. Moreover, the Court has concluded the plaintiff is entitled to $5,000 for pain and suffering sustained immediately subsequent to the injury. For past pain and suffering for the period commencing from discharge at the hospital until the date of trial, the Court finds that $45,000 constitutes a fair measure of damages. Finally, for future pain and suffering, the Court taking into account the severity of the pain and suffering which the plaintiff will endure, finds that an award of $380,000, based on the plaintiff's thirty-eight year life expectancy is just. Accordingly, the Court awards $490,000 for past, present, and future physical and mental pain and suffering.

The Court likewise finds that the plaintiff is entitled to $75,000 for his permanent disability and $70,000 for disfigurement, or a total of $145,000.

On the issue of future medical treatment, the Court finds that, based on testimony of Doctors Davis and Feldman, the plaintiff will require psychiatric attention for the remainder of his life and faces future hospitalization and surgical treatment. The Court awards $100,000 as compensation for reasonably foreseeable future medical expenses.

Concerning the guideline for awarding plaintiff lost wages, past and future, the Court holds that the evidence presented by Dr. Klaasen as it relates to loss of fringe benefits is too speculative and is not, therefore, a proper element to be considered in computing damages. Likewise, evidence of inflation is inadmissible under the Fifth Circuit holding of *Johnson v. Penrod Drilling Co.*, 510 F.2d 234 (Cir. 5, 1975), *cert. den.* 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58.

The plaintiff similarly presented evidence of the plaintiff's brother's earnings in order to use that sum as a means of computing lost wages. Although the plaintiff and his brother performed essentially the same tasks, the Court does not believe that it is proper to use William McLean's earnings, especially in view of the fact that the $6.59 per hour wage that the plaintiff relied on was not prevalent until subsequent to the injury. Accordingly, the Court employs the plaintiff's wage at the time of injury, i. e., $6.16 per hour, or $12,167 per year, to compute lost wages.

■ The Court's refusal to employ William McLean's salary is buttressed by the Court's use of a productivity factor of 5.7% which was achieved by computing the plaintiff's merit and change in job title increases during his twelve years at Avondale. The Court finds that the plaintiff has borne his burden of proof in this regard and that the 5.7% factor relates solely to productivity increases and is, in no way, compensation for inflation. *Higginbotham v. Mobil Oil Co.,* 545 F.2d 422 (Cir. 5, 1976); *Hamilton v. Canal Barge Co., Inc.,* 395 F.Supp. 978, 987 (E.D.La., 1975).

The Court also accepts the evidence presented by the plaintiff on the propriety of a 5¼% discount rate, and the evidence establishes that the plaintiff has a work-life expectancy of thirty years.

Considering all the foregoing, the Court finds that the plaintiff is entitled to an award of past lost wages of $21,342.00 and future lost wages of $390,904.00, for a total of $412,246.00.

The Court further finds that the plaintiff is entitled to an award of $55,634.56 for past medical treatment, which sum the plaintiff, under the terms of the Longshoremen's and Harbor Workers' Compensation Act, is obliged to return to his employer, Avondale Shipyards. Similarly, the plaintiff is required to reimburse Avondale in the amount of $16,773.07 for sums expended from the date of injury to January 3, 1977. Moreover, insofar as Avondale, during the pendency of this action expends any future sums, it will be entitled to reimbursement.

Accordingly, the Court holds that the plaintiff is entitled to recover for the following elements of damage:

1. Past, present and future pain and suffering   $ 490,000.00
2. Disability   75,000.00
3. Disfigurement   70,000.00
4. Lost wages, past and future   412,246.00
5. Past medical   55,634.56
6. Future medical   100,000.00

TOTAL   $1,202,880.56

Accordingly, the defendant, United States of America, is ordered to pay to the plaintiff, Robert C. McLean, the above stated sum.