**Virginia T. RYDER, Administratrix of the Estate of Lloyd A. Ryder and Individually, and as Personal Representative of the said Lloyd A. Ryder**

**v.**

**UNITED STATES of America**

**Civ. A. No. 77–1297–MA.**

United States District Court, D. Massachusetts.

Feb. 5, 1981.

Joseph G. Abromovitz, Latti & Flannery, Boston, Mass., for plaintiff.

James A. Lewis, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for defendant.

## OPINION

MAZZONE, District Judge.

This is an action under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.* (LHWCA), to recover damages for injuries to plaintiff's decedent as a result of the defendant's alleged negligence. The plaintiff is Virginia T. Ryder, widow and administratrix of the estate of the decedent, Lloyd A. Ryder (Ryder).[1] Defendant, the United States of America, at all times relevant to the instant controversy, owned and operated the U.S.S. FISKE (FISKE) in navigable waters in the Port of Boston, Massachusetts.

Ryder was injured on December 9, 1976, when he was struck by a burst of steam that emerged from a steam line on board the FISKE, while he was engaged in removing a valve from the line. At the time, Ryder was an employee of General Ship and Engine Works, Inc. (General Ship), a private contractor with whom the defendant had contracted to make certain repairs

1. Ryder was originally named as a plaintiff in the action, but died on September 23, 1980, before the trial began.

aboard the FISKE, and was acting within the scope of his employment.

The parties having agreed to a bifurcated trial by the court, sitting without a jury, the issue of liability was heard between December 15 and December 18, 1980. Pursuant to Fed.R.Civ.P. 52(a), the following findings of fact and conclusions of law are made.

### Findings of Fact

On December 3, 1976, the FISKE arrived at General Ship's yard in Boston, Massachusetts, for an overhaul and repairs, including the cleaning and repair of the ship's four boilers. Chief Engineer Richard Myers (Myers) was the naval officer in charge of the engine rooms, boiler spaces, and steam piping system aboard the FISKE. Prior to December, 1976, Myers had never served as engineering officer aboard a naval vessel undergoing repairs in a civilian shipyard.

Because the FISKE was scheduled to remain at the yard for several months, it was necessary to "lay up" the ship's boilers to prevent corrosion while they were out of service. Myers intended to lay up the boilers by draining and filling them with sodium nitrate, a procedure generally referred to as "dry lay up." After arriving in Boston, however, Myers was unable to obtain the necessary quantity of sodium nitrate immediately. As a result, he employed a temporary procedure known as a "steam blanket" to preserve the boilers until the necessary chemicals could be obtained. A steam blanket consists of maintaining low pressure steam on a boiler to inhibit corrosion while the boiler is in a "cold iron" or inactive state.

While the FISKE was undergoing repairs, its boilers were maintained in a cold iron state. Under the contract between the United States and General Ship, General Ship was obligated to supply shore steam for heating, showering, laundry, and other services, commonly referred to as "hotel

services."[2] The contract specifically called for 100 pounds of steam pressure to be supplied to a deck riser located on the port bow of the FISKE.[3] From that point, the steam was routed by members of the ship's crew through the FISKE's steam lines, for the purposes of maintaining the steam blanket and supplying hotel services to various portions of the ship.

Because of the presence of the steam blanket, it would have been dangerous for anyone to have removed steam valves or piping closely connected to a boiler unless the steam blanket were first removed, or an intervening valve secured,[4] so as to prevent the discharge of live steam upon removal of the valve. On the other hand, it was possible to perform work safely on pumps and other auxiliary systems, not directly associated with the main steam piping system or connected to any live steam lines. Before performing any such work, however, General Ship was required to notify and obtain permission from the member of the FISKE crew in charge of the space where the work was to be performed. Upon authorizing the work, the crewman was responsible for isolating, tagging, and locking the valves to be worked on, so as to insure the safety of the workers and the crew. A General Ship representative was then supposed to inspect the safety precautions and assure himself of their adequacy before undertaking work on the system. (Defendant's Exhibit 6, at 1).

Myers instructed members of the crew to inform him in the event any General Ship workers were seen performing unauthorized work on the steam piping system. He also instructed them to stop at once any work which appeared to pose a danger to the workers or the crew. Myers did not, however, specifically order that any valves which had the potential for releasing live steam if removed be locked or tagged.

On December 3, 1976, representatives of the FISKE, General Ship, and "Supship"[5] attended an arrival conference to discuss work to be performed on the ship. At that meeting, Myers informed the management of General Ship—specifically Vice President and General Manager Joseph Sanchez and his assistant, Gerard Melia—of the presence of a steam blanket aboard the FISKE. Sanchez protested, indicating that the steam blanket would impair the ability of General Ship to break down the steam piping system promptly and begin the overhaul. Myers, however, insisted that General Ship not perform any work on the steam piping system or the boilers without first getting permission from the ship.

On or about December 7, 1976, Propulsion Assistant Flavius Potopsingh, the officer in charge of the FISKE's fire and engine rooms, reported to Myers that Boiler Technician Gerald Lanham had discovered unauthorized work on the steam piping system. At Potopsingh's request, Myers went down into the fire rooms and saw that several steam valves had in fact been removed. The valves were auxiliary and turbo valves which were connected to, but not considered part of the main steam piping system. Myers ordered Potopsingh to make a list of each part that had been removed, an order he repeated on at least one other occasion prior to the accident.

On December 9, the day of the accident, Myers, Potopsingh, and several other members of the crew attended a progress meeting with representatives of General Ship

2. These hotel services were necessary, since the crew of the FISKE was living and working aboard the ship during the entirety of its stay in Boston.

3. Although the contract provided for 100 pounds to be supplied at all times, the evidence indicates that the actual steam pressure fluctuated, and at times may have been as low as 10 pounds.

4. In fact, industry custom required that, where possible, at least two valves connecting the

"dead" and "live" portions of the steam system be isolated (locked) prior to the commencement of work on any valve. See, infra, n. 17 at 559. This practice is commonly referred to as "two valve protection."

5. Supship is a shorthand expression for the Office of the Supervisor of Shipbuilding Conversion and Repair. It is a naval entity composed primarily of civilian experts who plan overhauls and act as intermediaries between shipyard personnel and the ship's crew.

and Supship. At that meeting, Myers informed General Ship that valves had been removed without permission. Sanchez was adamant about getting the steam blanket removed so that work on the main steam system could proceed. Myers became agitated, insisting that no more steam valves be removed without permission while the steam blanket remained on the boilers. He stated that his position on this issue was "not negotiable." Sanchez reluctantly agreed to obtain permission before removing any additional steam valves.

In the meantime, General Ship's employees had begun to dismantle the main steam piping system. Between December 6 and December 9, workers removed the main steam stop valves from boilers # 1 and # 2.[6] Upon removing these valves, some of the workers observed a trickle of water flowing from the steam lines where the valves had been. They reported their observations to General Ship Foreman Spyros Volicas, who told them not to worry about the water, but to be careful in removing main steam valves.

On December 9, plaintiff's decedent Lloyd Ryder assisted other General Ship personnel in removing "M.S. # 14," the main steam stop valve connected to boiler # 3, located in the aft fire room. That morning, Volicas requested permission from Boiler Technician Lanham—the officer directly in charge of the aft fire room—to work on the valve. Lanham refused to give the requested permission. Nevertheless, after a brief cessation of work in mid-morning, Volicas ordered the General Ship workers to continue removing M.S. # 14.

Removal of the valve, which weighed more than 1000 pounds, was a tedious and time consuming process, requiring the combined efforts of a number of workers. While machinists worked to remove bolts which secured M.S. # 14 to the main steam line (by means of flanges), riggers, including the decedent Ryder, secured "chain falls" to the valve itself. The chain falls were used to help maneuver the valve and, once all the bolts were removed, to lower it to the fire room floor.

During the course of the day, a number of unidentified crewmen passed through the aft fire room and the work space where M.S. # 14 was being removed. None of these crewmen warned the machinists and riggers that boiler # 3 contained low pressure steam, or attempted to stop the removal process. However, neither Myers, Potopsingh, nor Lanham were aware that M.S. # 14 was being removed. Had they had such knowledge, they would have stopped the work immediately, because of the danger of exposure to live steam associated with removal of the valve.

Following a lunch break, work resumed on M.S. # 14 at approximately 4:00 P.M. By this time, most of the crew members were off duty, and none were present in the aft fire room. By about 4:30, only one bolt remained to be removed. The riggers maneuvered M.S. # 14 away from the main steam line, in order to facilitate removal of the bolt. As a result of this maneuver, the main steam line was wholly exposed to the interior of the fire room. At some point during this operation, a trickle of cool or lukewarm water was observed coming from the opening in the steam line.

Approximately 10 minutes later, while the workers were waiting for a welder to arrive and burn off the remaining bolt, an announcement—"secure steam aft" or "secure deck steam aft"—was heard over the ship's public address system.[7] Moments later, a burst of hot water and steam emerged from the exposed main steam line, striking Ryder and seriously injuring him.

At trial, plaintiff's expert, an experienced marine consulting engineer, opined that the burst of steam was most likely produced

---

**6.** A main steam stop valve is the first valve on the discharge side of a boiler. Since it is impossible to have a locked valve between it and the boiler, it is only safe to work on a main steam valve when there is no steam in the boiler.

**7.** The evidence indicates this was an order to the ship's crew to terminate the flow of steam for hotel services to the aft portion of the ship.

when a crew member cycled a valve in the aft engine room, thereby introducing steam into the boiler and the main steam line. There was some testimony that shortly after the accident a crew member told one of the General Ship employees that he had seen another crewman cycle such a valve just prior to the accident.

An alternative theory considered but rejected by plaintiff's expert, was that the burst of steam was caused by a bubble of low pressure steam, present in the boiler at all times as part of the steam blanket, which rose through a column of standing water in the boiler and escaped as a result of a sudden change in pressure in the steam line.

Given the paucity of evidence on this point, we need not speculate as to the precise factual cause of the burst of steam. Cf., *McLean v. United States*, 446 F.Supp. 9 (E.D.La.1977).[8] In our view, we need not decide whether either of the above theories accurately accounts for the sudden burst of steam in order to resolve the issue of liability in this case. The government's liability for Ryder's accident depends upon whether, considering all the circumstances, the members of the FISKE's crew failed to exercise reasonable care in protecting the decedent from the dangers associated with removal of M.S. # 14 in the presence of a steam blanket.

### Conclusions of Law

This Court has jurisdiction over the parties and the subject matter, pursuant to the Public Vessels Act, 46 U.S.C. § 781 *et seq.*, and the Suits in Admiralty Act, 46 U.S.C. § 741 *et seq. See, Weyerhauser Steamship Company v. United States*, 372 U.S. 597, 600, 83 S.Ct. 926, 928, 10 L.Ed.2d 1; *Allen v. United States*, 338 F.2d 160, 162 (9th Cir. 1964), *cert. denied*, 380 U.S. 961, 85 S.Ct. 1104, 14 L.Ed.2d 152 (1965).

Plaintiff, Virginia T. Ryder, as the widow and administratrix of the estate of the decedent, Lloyd A. Ryder, is entitled to maintain this action for damages under the LHWCA. *See, Raymond v. I/S CARIBIA*, 626 F.2d 203 (1st Cir. 1980); *Smith v. Eastern Seaboard Pile Driving, Inc.*, 604 F.2d 789 (2nd Cir. 1979).

Liability in this case is governed by the provisions of the LHWCA.[9] The First Circuit has recently articulated the standard of care imposed upon shipowners by section 5(b) in *Johnson v. A/S Ivarans Rederi*, 613 F.2d 334 (1st Cir. 1980) (petition for certiorari filed, 48 U.S.L.W. 3679). Rejecting the

---

8. In *McLean*, as in the instant case, the employee was injured by a burst of steam from an opening in the steam line. The court concluded that the injury resulted from the defendant's active negligence in erroneously opening a valve which directed live steam into the line. In that case, however, there was ample direct evidence concerning the valve and the particular crewman involved. 446 F.Supp. at 11. In this case, by contrast, there was no evidence, apart from the hearsay testimony of a General Ship employee, that *any* valves were opened prior to the accident, much less one of those identified by plaintiff's expert. Accordingly, there is no basis on which to conclude that Ryder's injury resulted from active negligence on the part of the defendant.

9. Section 5(b) of the LHWCA, 33 U.S.C. § 905(b) provides as follows:

*In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party* in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. *If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel.* The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. *The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.*
(emphasis added).

position, adopted by several circuits,[10] that sections 343 and 343A of the Restatement (Second) of Torts provide the appropriate standard of care in all cases,[11] the Court held that the proper standard is one of reasonable care under all the circumstances. 613 F.2d at 348. This standard permits a finding of negligence upon a showing:

(1) that the vessel knew of or by the exercise of reasonable care could have discovered the condition on board ship that led to the injury;

(2) that the vessel knew or should have known that the condition would pose an unreasonable risk of harm to longshoremen working on board ship; and

(3) that the vessel failed to exercise reasonable care to protect the longshoremen against that danger.

*Id.*

In deriving the standard of reasonable care under the circumstances, the Court reviewed the Congressional policies reflected in the 1972 amendments to the LHWCA. Paramount among these was Congress' desire to create incentives for safety in "the nation's second most dangerous profession." *Id.* at 339. In order to effectuate this goal, the Court concluded:

Each party in the stevedoring triangle, including the vessel, must bear the cost of his own negligence. No party may be granted refuge in legal doctrines, such as unseaworthiness, strict liability, assumption of the risk or contributory negligence, which foreclose inquiry into the reasonableness of that party's conduct under the circumstances.

*Id.* at 347.

In addition, the Court affirmed the fact that the LHWCA is a remedial statute, enacted to protect the longshoreman and not the vessel. "Doubt as to the interpretation of the Act and the development of standards of care implementing it must be resolved in favor of the longshoreman." *Johnson, supra,* 613 F.2d at 347–48 (citing *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979)).

Before considering whether the ship violated the applicable standard of care in this instance, there is a preliminary question concerning the scope of its duty to protect the decedent from dangerous conditions on board. Although not explicitly stated in these terms, the government impliedly sug-

**10.** A split of authority exists on the proper standard of care owed longshoremen by vessels under section 5(b) of the LHWCA. *See, Napoli v. Hellenic Lines,* 536 F.2d 505 (2d Cir. 1976); *Anuszewski v. Dynamic Mariners Corp., Panama,* 540 F.2d 757 (4th Cir. 1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d 1233 (5th Cir. 1977); *Clemons v. Mitsui O.S.K. Lines, Ltd.,* 596 F.2d 746 (7th Cir. 1979) (all applying sections 343 and 343A of the Restatement (Second) of Torts). Cf., *Griffith v. Wheeling-Pittsburgh Steel Corp.,* 610 F.2d 116 (3d Cir. 1979); *Santos v. Scindia Steam Navigation Co., Ltd.,* 598 F.2d 480 (9th Cir. 1979) (applying a standard of reasonable care under the circumstances).

The Supreme Court granted certiorari in *Scindia* on May 12, 1980, 446 U.S. 934, 100 S.Ct. 2150, 64 L.Ed.2d 786, and heard argument December 1, 1980, 49 U.S.L.W. 3453.

**11.** Section 343 provides:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
  (a) knows or by the exercise of reasonable care would discover the condition, and

should realize that it involves an unreasonable risk of harm to such invitees, and
  (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
  (c) fails to exercise reasonable care to protect them against the danger.

Section 343A provides:

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.

The Court rejected the standards embodied in the above provisions primarily because it felt that they incorporate elements of the defense of assumption of risk, a defense Congress eliminated in the 1972 amendments to the LHWCA. *See, Johnson, supra,* 613 F.2d at 347.

gests in both its trial brief and post trial memorandum, that its duty of care was diminished or discharged in the instant case, either because it did not exercise supervisory control over the work on the steam system, or because certain provisions in the repair contract placed the duty to provide for the safety of General Ship's employees exclusively upon General Ship.

First, we do not agree that control is dispositive of the duty issue. In adopting a standard of reasonable care under the circumstances, the First Circuit in *Johnson* rejected the notion that responsibility for the safety of longshoremen and harbor workers automatically shifts when a stevedore or repair contractor assumes control over the workplace. *Johnson, supra,* 613 F.2d at 334. Under the reasonable care standard, control may be relevant in determining what constitutes due care in particular circumstances. However, we do not accept the view that once a shipowner relinquishes control over the work area, its duty to exercise reasonable care thereby shifts or is automatically limited to only dangerous conditions of which it has actual knowledge.[12] Such a rule is incompatible with the LHWCA's twin policies of promoting safety in the longshoring industry and of assigning liability on the basis of fault.

In any event, the degree of control retained by the crew of the FISKE in this case was sufficient to impose upon it a full duty of reasonable care even under traditional principles of owner liability. The

defendant correctly asserts that the ship did not supervise the day-to-day repair work. However, numerous other indicia of control support the imposition of a full duty of care in this instance. First, the United States did not surrender custody and control of the vessel to General Ship, but rather kept a full crew on board and retained ultimate control at all times. *Cf., Hess v. Upper Mississippi Towing Corp.,* 559 F.2d 1030, 1031, 1033 (5th Cir. 1977) (directed verdict in favor of shipowner upheld where, *inter alia,* the vessel was under the "sole control" of the injured worker's employer). The shore steam supplied by General Ship was piped aboard solely for the benefit of the ship and its crew. Not only did the crew know that steam was aboard the vessel, they in fact exercised complete control over the flow of steam aboard the FISKE at all times, both in connection with the hotel services as well as the steam blanket.

Beyond this, the ship's personnel consulted regularly with General Ship concerning the details of the repair work to be performed. Prior to performing any work on the steam lines, workers were required to inform and obtain the permission of the crewman "in charge of the space" where the work was to be performed. The evidence indicates these crewmen were far more familiar with the location and operation of the boilers, steam lines and valves than the decedent and his fellow employees.[13] Finally, any crew member had the authority to stop at once any work which

---

**12.** The proper effect of the owner's surrender of control under the reasonable care standard was articulated by the Ninth Circuit in *Santos* as follows:

Under the [reasonable care] standard we have adopted, control would be relevant to the extent that it might limit the shipowner's opportunities to inspect for dangerous conditions or to remedy such conditions. We agree that in some cases, control may play a critical role in determining the appropriate standard of care. Nevertheless, we do not follow those cases which have focused exclusively or primarily on whether the shipowner relinquished control of the stevedoring to the employer of the injured longshoreman. Instead, we focus on the reasonableness of the shipowner's conduct in the light of his practi-

cal opportunities to discover defective conditions and remedy them.

*Santos, supra,* 598 F.2d at 490. As to the demise of the "control test," *see generally, Evans v. Transportacion Maritime Mexicana SS "Campeche",* 639 F.2d 848, 854–55 (2d Cir. 1981); *Note: The Injured Longshoreman vs. The Shipowner After 1972: Business Invitees, Land-Based Standards, and Assumption of Risks,* 28 Hastings L.J. 771, 798–90, 792–95 (1977).

**13.** Thus, this is not a "typical" case where, for example, a stevedore is hired for its particular expertise in handling cargo and therefore may be relied upon to anticipate certain hazards and take all the necessary precautions. *Cf., Raymond v. I/S CARIBIA, supra,* 626 F.2d at 206.

appeared to pose a danger to the workers or the crew.[14] Under these circumstances, the ship is properly charged with liability for any injury caused by the negligent exercise of its retained control over the ship's steam system and work spaces. *See, Lawson v. United States*, 605 F.2d 448, 450–51 (9th Cir. 1979) (retention of similar degree of control supported district court's finding of liability based upon shipowner's negligence); Restatement (Second) of Torts, § 414 and Comment a;[15] 1A *Benedict on Admiralty*, § 114, at 6–14 (1980).

Nor did the repair contract with General Ship relieve the ship of its duty to exercise reasonable care. Both the contract,[16] and the relevant Department of Labor Safety and Health Regulations[17] incorporated therein by reference, did impose upon General Ship a duty to insure that all valves were properly tagged and isolated before allowing its employees to begin work on the steam piping system. The defendant, in its trial brief, asserts that "The vessel could not and did not assume General Ship's obligations." (Trial Memorandum on

**14.** The government also reserved the right to inspect and test all material and workmanship to determine its quality and suitability for the purpose intended, and to reject any material or workmanship found to be defective. (Master Contract, Clause 5(c), Defendant's Exhibit 12, at 9). It reserved the right to make changes at any time in any drawings, specifications, work itemized in any job order, time or place of performance of any work, and otherwise vary the requirements of the job order within the general scope thereof. (*Id.*, Clause 6, at 4). Finally, the government reserved the right to terminate the performance of work under any job order whenever the contracting officer determined that such termination was in the best interests of the government. (*Id.*, Clause 16(a), at 11).

**15.** Section 414 of the Restatement provides as follows:

One who entrusts work to an independent contractor, but who retains control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Comment a in turn, provides, in pertinent part: The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or *to forbid its being done in a manner likely to be dangerous to himself or others.* Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.

(emphasis added). As to the judicial interpretation and application of section 414, *see, Summers v. Crown Construction Corporation*, 453 F.2d 998, 1000 (4th Cir. 1972). *Cf., Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1251–53 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977).

**16.** Clause 24 of the contract, entitled "Department of Labor Safety and Health Regulations for Ship Repairing" provides:

Attention of the Contractor is directed to Public Law 85–742, approved August 23, 1958 (72 Stat. 895, 33 U.S.C. 941), amending section 41 of the Longshoremen's and Harbor Workers' Compensation Act and to the Safety and Health Regulations for Ship Repairing promulgated thereunder by the Secretary of Labor (29 C.F.R. 1501). These regulations apply to all ship repair and related work, as defined in the regulations, performed under this contract on the navigable waters of the United States including any drydock or marine railway. Nothing contained in this contract or any job order thereunder shall be construed as relieving the Contractor from any obligations which it may have for compliance with the aforesaid regulations.

**17.** The applicable regulation, 29 C.F.R. § 1915.-92, provides:

*Ship's piping systems.*

(a) Before work is performed on a valve, fitting, or section of piping in a piping system where employees may be subject to injury from the direct escape of steam, or water, oil, or other medium at a high temperature, the employer shall insure that the following steps are taken:

(1) The isolation and shutoff valves connecting the dead system with the live system or systems shall be secured, blanked, and tagged indicating that employees are working on the systems. This tag shall not be removed nor the valves unblanked until it is determined that this may be done without creating a hazard to the employees working on the system, or until the work on the system is completed. Where valves are welded instead of bolted at least two isolation and shutoff valves connecting the dead system with the live system or systems shall be secured, locked, and tagged.

Behalf of the United States, December 4, 1980, at 2, n. 1).

However, this argument misses the mark. While concededly, the contract and regulations imposed certain affirmative obligations upon General Ship with respect to the safety of its employees, nothing in either the contract or regulations purports to, nor could it, absolve the vessel or its crew from its duty to exercise reasonable care in providing for the safety of all persons lawfully on board. *See, Speller v. American Export Lines*, 1977 A.M.C. 501 (E.D.Va.1975) (Department of Labor Regulations did not preempt duty imposed upon shipowner by Coast Guard regulations); *Benedict, supra*, § 113, at 6–11 (regulations not intended to relieve shipowners from responsibilities placed upon them by law, regulation or custom). On the contrary, the very regulations cited by defendant belie its assertion that General Ship's duty to provide for the safety of its employees was intended to be exclusive. *See*, 29 C.F.R. § 1915.1(d).[18]

As discussed *infra*, at 561, there was ample evidence presented at trial of the existence of a duty, imposed by custom and practice upon shipowners, to provide for the safety of workers by isolating, locking, and/or tagging any valves which might pose a danger if cycled or removed. This duty was neither discharged, nor pre-empted, by anything in the repair contract or safety regulations.

Turning to the first element of the *Johnson* test, we conclude that the defendant, through the exercise of reasonable care, could have discovered the condition on board the ship that led to the injury. The dangerous condition in this case arose from the concurrence of two events, neither of which alone was sufficient to create an unreasonable risk of harm. One of these, the presence of a steam blanket on the FISKE's boilers, was the result of actions taken by the crew under the direction of Chief Engineer Myers. The second, i. e., the removal of main steam valves, and M.S. # 14 in particular, was the result of the actions of the workers pursuant to instructions from General Ship.

Boiler Technician Lanham was identified at trial as the officer "in charge" of the aft fire room. Lanham reported to Main Propulsion Assistant Potopsingh, who in turn reported directly to Myers. Each of these men was aware that unauthorized work had been performed on the steam piping system several days before the accident. On at least two occasions, Myers instructed Potopsingh to inspect the steam lines and compile a list of all equipment removed without permission. Potopsingh, however, failed to discover that several main steam valves had already been removed prior to December 9. On the morning of the accident, Volicas approached Lanham and specifically requested permission to work on M.S. # 14. Concededly, Lanham acted properly in refusing to give Volicas permission to remove the valve. However, even though Lanham knew that unauthorized work had been performed, and, according to his own testimony, he had personally observed a number of situations which he considered dangerous, Lanham failed to notify Potopsingh or Myers of the request, or remain in the area long enough to make sure M.S. # 14 was not removed.

In *Santos*, a longshoreman sued the defendant shipowner for injuries sustained when several sacks of grain fell from a pallet and struck him while he was working in the ship's hold. The district court granted the defendant's motion for summary judgment, in part because the undisputed facts revealed that the shipowner did not have *actual knowledge* that a winch being used to lower the wooden pallets containing the sacks was malfunctioning. The Ninth Circuit reversed. In discussing the element of knowledge, the Court stated:

---

**18.** This regulation provides as follows:

It is not the intent of the regulations in this part to place additional responsibilities or duties on owners, operators, agents, or masters of vessels unless such persons are acting as employers, *nor is it the intent of these regulations to relieve such owners, operators, agents, or masters of vessels from responsibilities or duties now placed upon them by law, regulation, or custom.*

29 C.F.R. § 1915.1(d) (emphasis added).

[A] shipowner ignorant of an unreasonably dangerous condition may be negligent in not protecting longshoremen against it, if "the exercise of reasonable care would [have] discover[ed] the condition."

598 F.2d at 489 (citations omitted).

■ Under the circumstances, reasonable care would have required that Lanham at least notify Potopsingh or Myers of Volicas' request, or, alternatively, that he remain in the aft fire room, the area within his charge, long enough to assure himself that M.S. # 14 was not removed without permission. Either course of action, we believe, would have provided the defendant with actual knowledge of the existence of the condition which resulted in Ryder's accident. By contrast, the evidence indicates that Lanham disappeared from the work space shortly after the Volicas inquiry, and did not return for the balance of the day.[19] Under all the circumstances, the defendant failed to exercise reasonable care in ascertaining the existence of the dangerous condition which caused Ryder's injury.

Applying the second element of the *Johnson* test, there is virtually no dispute concerning the defendant's knowledge that removal of M.S. # 14 in the presence of a steam blanket would pose an unreasonable risk of harm to the General Ship employees working in the aft fire room. M.S. # 14 was the first valve connected to the steam line running from boiler # 3. All of defendant's supervisory personnel testified at trial that the removal of main steam valves in the presence of a steam blanket would have been extremely dangerous, and that, had they known the work was proceeding, they would have stopped it immediately. Nor was there any need for the valve to be removed at that time. The evidence indicated that there were numerous tasks which could safely be performed, pursuant to the repair contract, while the steam blanket was on the boilers. *See, Johnson, supra,* 613 F.2d at 348 (whether risk of harm is unreasonable may be determined by balancing the usefulness of the condition and the burden of curing it against the probability and severity of the harm that it poses).

■ Finally, we address the question whether the ship and its crew exercised reasonable care in protecting Ryder and his fellow workers against the danger produced by the removal of M.S. # 14. Several witnesses, including plaintiff's expert, testified to a long standing custom and practice in the shipping industry, that imposes upon a ship entering a repair yard a duty to isolate, lock, and/or tag any valves which should not be cycled or removed. (Plaintiff's Exhibit 3, at 8–4). *Accord, McLean, supra,* 446 F.Supp. at 11 (court in dictum acknowledged the existence of such a duty). *See also, Butler v. O/Y Finnlines, Ltd.,* 537 F.2d 1205, 1207–08 (4th Cir.), *cert. denied,* 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 180 (1976) (conduct inconsistent with custom and practice is relevant to the issues of negligence and establishment of the proper standard of care). The reason for this practice is that ordinarily, the ship's crew is more familiar with the steam system; more likely to be able to anticipate potential dangers; and in a better position to take the necessary precautions to prevent the accidental opening or removal of a live steam valve.

In this case, however, Chief Engineer Myers never instructed the crew to isolate, tag, or lock any valves aboard the FISKE, even though he knew that live steam was going to be present aboard the ship for the combined purposes of providing hotel services and a steam blanket. Even after he personally verified reports that unauthorized work had been performed on the steam piping system, Myers failed to order that any precautions be taken by the crew.

---

19. At trial the government offered no explanation for Lanham's disappearance from the fire room. In its post trial memorandum, the government simply asserts that the ship had neither actual or constructive knowledge of the condition, because:

Mr. Myers, Mr. Potopsingh and Mr. Lanham were all engaged in duties that day. Their duties included work on and off the ship. They did not, in the course of the day, have any duty in the area of the work.

(Post Trial Brief on Behalf of the United States, January 12, 1981, at 7, and n. 13).

Concededly, Myers did warn the *management* of General Ship not to perform any additional work on the steam system without permission. This warning, however, was inadequate, for two reasons.

First, the duty to exercise reasonable care runs from the shipowner to the workers themselves:

> As the shipowner owes a direct duty to longshoremen and harbor workers to provide a reasonably safe place to do their work, he is not absolved of the duty by making their employer aware of any existing danger if he does not also take steps to warn the workers themselves.

*Benedict, supra,* § 112, at 6–8, 6–9. The evidence indicates that the ship never took steps to warn the General Ship workers, either of the presence of a steam blanket aboard the FISKE, or of the danger associated with removal of main steam valves in the presence of a steam blanket.[20]

Beyond this, the evidence indicates Myers should have been aware that the warning to General Ship's management was inadequate to provide for the safety of the workers. Myers clearly informed General Ship at the arrival conference, some six days before the accident, that no work should be performed on the steam system without permission, due to the presence of a steam blanket on the boilers. The subsequent reports, personally verified by Myers, that unauthorized work had actually been performed, should have alerted him to the fact that additional warnings would be similarly disregarded.[21]

Under the circumstances, reasonable care would have required that Myers order the crew to tag and/or lock any valve that could pose a danger to the workers or the crew if cycled or removed, or take other precautions to insure that no live steam valves were removed. Reasonable care by Lanham would have required that he report Volicas' request to remove M.S. # 14 to Potopsingh or Myers, or at least that he remain in the fire room long enough to assure himself that the valve would not be removed that morning. Any of these precautions would most likely have prevented Ryder's accident. Under the circumstances, the defendant's failure to take any of them violated the standard of reasonable care, and therefore constituted negligence.

There remains to be considered the issue of causation. The defendant contends that General Ship's negligent violation of the applicable safety regulations, *see* n. 17, *supra,* was the sole cause of Ryder's injury. (Trial Memorandum, *supra,* at 5). We agree that General Ship was negligent, flagrantly so, in allowing its workers to remove main steam valves in the presence of a steam blanket. *See, Benedict, supra,* § 113, at 6–11 (when harm occurs as a result of violation of applicable safety regulations, such violation constitutes negligence without more). However, we cannot agree that General Ship's negligence was the sole cause of Ryder's accident.

We conclude that plaintiff has met her burden of proving that defendant's negligence was a cause-in-fact of the injury. But for the ship's failure to tag or lock M.S.

---

**20.** There was some testimony to the effect that several General Ship workers may have been aware of the presence of the steam blanket. However, of these, at least two, riggers William Adreani and Fred Silck, stated that they did not understand the meaning of the term "steam blanket." Even the foreman, Volicas, stated that although he was familiar with the practice of keeping low pressure steam on a boiler, he was not familiar with the use of the term "steam blanket" to describe that practice.

In any event, all these witnesses testified without contradiction that no one on board the FISKE informed them of the presence of low pressure steam on boiler # 3.

**21.** This very point was made at trial by Willard Wiggin, a representative of Supship called as a witness by the government. On cross-examination, Wiggin testified that Myers' failure to tag and lock the valves on the FISKE was not consistent with good engineering safety practice. When asked on redirect to explain why this was so, Wiggin stated that by performing unauthorized work on the steam system, General Ship's management had indicated a willingness to ignore the ship's warnings. Accordingly, something more than warnings to the management was required to insure the safety of the workers and the crew.

# 14 or take any other reasonable safety precautions, the accident would not have occurred. *See, Lawson v. United States, supra* 605 F.2d at 450; Restatement (Second) of Torts, §§ 430–433; *Prosser on Torts,* Ch. 7, § 41, at 240 (in majority of cases, "substantial factor" and "but for" causation are identical; either satisfies cause-in-fact requirement).

In addition, Ryder's injury was a foreseeable consequence of defendant's negligence, and accordingly, that negligence proximately caused the injury. *Lawson, supra,* 605 F.2d at 450; *Prosser, supra,* §§ 42–43; *Cf., Restatement, supra,* at §§ 431, 435 (foreseeability and proximate cause requirement eliminated).

Finally, General Ship's negligence was reasonably foreseeable. Accordingly, it cannot be considered a superseding cause of Ryder's accident. *See, McCarthy v. Silver Bulk Shipping Ltd.,* 487 F.Supp. 1021, 1027–28 (E.D.Pa.1980); *Restatement, supra,* at § 446(a); *Prosser, supra,* § 44 at 272–75.

 We conclude that the negligence of the ship and that of General Ship concurrently caused Ryder's injury. Liability based upon a finding of concurrent causation is clearly permissible under the 1972 amendments to the LHWCA. *See, Johnson, supra,* 613 F.2d at 350, n. 15 and accompanying text; *Santos, supra,* 598 F.2d at 489; *Sarauw v. Oceanic Navigation Corp.,* 622 F.2d 1168, 1173 (3d Cir. 1980) (petition for certiorari filed, 49 U.S.L.W. 3135); *Lopez v. A/S Svendborg,* 581 F.2d 319, 324–26 (2d Cir. 1978); *Restatement, supra,* § 430, Comment d.

 Finally, we address briefly the issue of comparative negligence. The 1972 amendments to the LHWCA clearly permit limitations upon a plaintiff's recovery based upon the admiralty doctrine of comparative negligence. *Johnson, supra,* 613 F.2d at 345 (citing *Gallardo v. Westfal-Larsen & Co.,*

A/S, 435 F.Supp. 484, 494 (N.D.Cal.1977)). This defense, erroneously characterized as contributory negligence, was initially raised in defendant's Answer to plaintiff's Amended Complaint. Since defendant has failed to argue the issue in either its trial brief or post trial brief, we assume it has waived the defense. In any event, there was simply no evidence adduced at trial that would tend to indicate that Ryder was negligent. There was no evidence indicating that Ryder was aware of the presence of steam in boiler # 3. As the government acknowledges, the drains when opened, did not emit water. The piping was not hot. The system, when opened, did not emit hot water or steam. (Post Trial Brief, *supra,* at 8). There was no evidence that any member of the crew or General Ship employee informed Ryder of the presence of steam in the line. Accordingly, we conclude that the accident in no way resulted from any negligence on the part of the decedent.

## Summary

The defendant was negligent in failing to exercise reasonable care to protect Ryder from a dangerous condition of which defendant should have been aware. The defendant's negligence proximately caused Ryder's injury. Ryder was not himself negligent. Accordingly, the defendant is liable for all damages caused by the negligence of the defendant. *Edmonds v. Compagnie Generale Transatlantique, supra.*[22] This matter will continue on the issue of damages.

---

**22.** Without belaboring the point, we add our support to those who have criticized that aspect of the LHWCA scheme which permits a shipowner to be held liable for the full extent of the longshoreman's injuries, even though the longshoreman's employer was primarily responsible for the accident. *See, Evans v. Transportacion Maritime Mexicana SS "Campeche", supra,* slip opinion at 863–64 (Friendly, J., concurring). Such a result seems palpably unjust and inconsistent with the Congressional policy of promoting safety in the industry. *Id.*