### In re ALL MAINE ASBESTOS LITIGATION.

United States District Court,
D. Maine.

Feb. 23, 1984.

See also, 575 F.Supp. 1375.

G. William Higbee, Brunswick, Me., Thomas W. Henderson, Pittsburgh, Pa., William A. Mulvey, Jr., James G. Noucas, Jr., Mark F. Sullivan, Portsmouth, N.H., Lawrence C. Winger, Portland, Me., Melvin I. Friedman, Kriendler & Kriendler, New York City, Dan W. Thornhill, Kittery, Me., Michael P. Thornton, Boston, Mass., for plaintiffs.

Peter L. Murray, Thomas C. Newman, Portland, Me., for Amchem Products, Inc.

Harrison L. Richardson, Jeffrey Thaler, Thomas Getchell, Portland, Me., for Armstrong World.

M. Roberts Hunt, Glenn Robinson, Portland, Me., for Celotex Corp.

C. Alan Beagle, Portland, Me., for Combustion Engineering.

Theodore J. Kurtz, South Paris, Me., for Congoleum.

Frederick C. Moore, Portland, Me., for Cummings Insulation and Claremont Co., Inc.

John R. Linnell, Auburn, Me., for Eagle-Picher Industries.

Thomas Schulten, Portland, Me., for Eastern Refractories.

U. Charles Remmel, Portland, Me., for Fibreboard Corp.

Jack H. Simmons, Lewiston, Me., for Forty-Eight Insulations.

Jotham D. Pierce, Jr., Daniel Emery, Portland, Me., for G.A.F. Corp.

George F. Burns, Portland, Me., for Garlock, Inc.

Phillip D. Buckley, Bangor, Me., for Johns-Manville.

Thomas F. Monaghan, Kevin G. Libby, Deborah J. Ross, Portland, Me., for Keene Corp.

John J. Flaherty, Christopher D. Nyhan, Jonathan S. Piper, Portland, Me., for Nicolet, Inc.

Nicholas S. Nadzo, John Montgomery, Portland, Me., for Owens-Corning Fiberglas.

Peter J. Rubin, Linda Monica, Portland, Me., for Owens-Illinois.

John A. Mitchell, James G. Goggin, Portland, Me., for Pittsburgh Corning.

Charles H. Abbott, Steven Wright, Lewiston, Me., for H.K. Porter Co.

Thomas R. McNaboe, Mark G. Furey, Portland, Me., for Raymark, Inc.

Charles H. Abbott, Steven Wright, Lewiston, Me., for Southern Textile Co.

Randall E. Smith, Saco, Me., for J.P. Stevens & Co.

Robert F. Hanson, Mark G. Lavoie, Portland, Me., for Bath Iron Works Corp.

Paula D. Silsby, Asst. U.S. Atty., Portland, Me., Harold J. Engel, Asst. Dir., and S. Michael Scadron, Trial Atty., Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Peter W. Culley, Stephen C. Whiting, Portland, Me., for Scott Paper Co.

## MEMORANDUM OF OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

Presently pending in this Court are approximately 225 actions which have been brought by present and former employees, and the representatives of deceased employees, of either Bath Iron Works (BIW), a private shipyard located in Bath, Maine, or Portsmouth Naval Shipyard (PNS), a government shipyard in Kittery, Maine, against various manufacturers and suppliers of asbestos-containing products. Plaintiffs seek to recover compensatory and punitive damages for injuries the employees allegedly sustained by exposure to and inhalation of asbestos dust during the course of their employment at the shipyards while performing construction or repair work on U.S. naval vessels. The com-

plaints assert causes of action based on negligence, strict liability, and breach of express and implied warranties. Jurisdiction is predicated upon diversity of citizenship. 28 U.S.C. § 1332(a); *Austin v. Unarco Industries, Inc.*, 705 F.2d 1, 3 (1st Cir. 1983).

In addition to denying any liability to the plaintiffs, certain defendants have commenced third-party actions for contribution and/or indemnification against the United States of America. With the Court's approval, defendants have filed Model Third-Party Complaint A in each of the actions filed on behalf of present or former employees at BIW and Model Third-Party Complaint B in each of the actions filed on behalf of present or former employees at PNS. Pursuant to Fed.R.Civ.P. 12(b)(1) and (6) and Fed.R.Civ.P. 56, the United States has filed motions to dismiss (or, alternatively, for summary judgment on) the defendants' model third-party complaints upon the grounds that this Court lacks subject matter jurisdiction, that the third-party complaints fail to state claims upon which relief can be granted, that there is no genuine issue as to any material fact, and that the United States is entitled to a judgment as a matter of law. The record before the Court consists of the pleadings, depositions, answers to interrogatories, admissions and affidavits on file. The issues have been comprehensively briefed and argued.

In ruling upon the United States' motions to dismiss, the allegations of the third-party complaints must be accepted as true, the complaints are to be liberally construed, and they "should not be dismissed unless it appears that the third-party plaintiffs could 'prove no set of facts in support of [their] claim[s] which would entitle [them] to relief.'" *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969); *Ballou v. General Electric Co.*, 393 F.2d 398, 399 (1st Cir.1968). In ruling upon the United States' motions for summary judgment, all facts are to be construed most strongly in favor of the third-party plaintiffs and all

doubts must be resolved in their favor. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Summary judgment can be no substitute for trial where there are disputed factual issues, *Walgren v. Howes*, 482 F.2d 95, 98 (1st Cir.1973), and summary judgment may not be granted if there is a "genuine issue as to any material fact." Fed.R.Civ.P. 56(c).

The Court will first consider the United States' motion to dismiss, or for summary judgment on, Model Third-Party Complaint A. The Court will then address the United States' motion to dismiss, or for summary judgment on, Model Third-Party Complaint B.

I.

*Model Third-Party Complaint A: BIW Cases*

Model Third-Party Complaint A contains nine counts. In the first eight counts, defendants seek indemnity and/or contribution by the United States variously based on its status as a seller of raw asbestos fibers and products containing asbestos (Counts I, II, III), as the promulgator of specifications requiring the use of asbestos products at BIW (Counts IV, V), as the entity in control of the work at BIW (Counts IV, V, VII, VIII), and as the owner of naval vessels at BIW (Count VI). In addition, if it should be determined that admiralty jurisdiction is applicable to the actions, a final count seeks indemnification and/or contribution from the United States on admiralty and maritime law principles (Count IX). Jurisdiction over these claims is asserted under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) & 2671–2680; the Tucker Act, 28 U.S.C. § 1346(a)(2); and under the general maritime and admiralty jurisdiction of the federal courts, 28 U.S.C. § 1333, the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, the Public Vessels Act, 46 U.S.C. § 781–790, and the Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 740.

The Court will separately discuss each of the nine counts in Third-Party Complaint A.

A. *Count I*

Count I of Third-Party Complaint A seeks noncontractual indemnification and contribution from the United States, as a seller of asbestos to certain of the defendants and to BIW, based upon the government's alleged negligent failure to provide warnings regarding the hazards of asbestos exposure. Count I must be dismissed for lack of subject matter jurisdiction.

The doctrine of sovereign immunity prevents this Court from exercising jurisdiction over a claim against the United States unless the United States has consented to suit on the claim. *Honda v. Clark*, 386 U.S. 484, 501, 87 S.Ct. 1188, 1197, 18 L.Ed.2d 244 (1967). Defendants urge that waiver of the United States immunity from suit on this claim can be found in the FTCA.

The FTCA subjects the United States to liability

> for money damages ... for ... personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b); *see also* 28 U.S.C. § 2674.[1] The United States does not deny either that it sold asbestos or that it failed to warn regarding the hazards of asbestos exposure. It contends, however, that Count I alleges conduct for which it cannot be liable by reason of 28 U.S.C. § 2680(a), the discretionary function exception to the government's liability under the FTCA.

Section 2680(a) provides in relevant part that the provisions of the FTCA shall not apply to

> (a) Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The leading case interpreting the discretionary function- exception is *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In that case the Supreme Court stated:

> The "discretion" protected by the section is not that of the judge—a power to decide within the limits of positive rules of law subject to judicial review. It is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law.
>
> \* \* \* \* \* \*
>
> It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. *It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion.* It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

---

1. Section 2674 provides in relevant part:

 The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

346 U.S. at 34, 35–36, 73 S.Ct. at 967–968 (footnotes omitted) (emphasis supplied).

The numerous cases decided since *Dalehite* have not been consistent in determining the types of activities which come within the discretionary function exception. Some general principles have, however, emerged. Thus, some courts have looked to see if the governmental decision required a balancing of such policy factors as the cost of a program and its potential benefit. *See, e.g., Griffin v. United States,* 500 F.2d 1059, 1064 (3d Cir.1974). This analysis finds support in the previously quoted statement of the Supreme Court in *Dalehite* that "[w]here there is room for policy judgment and decision there is discretion." 346 U.S. at 36, 73 S.Ct. at 196. Other courts have sought to determine whether the decision was made at a "planning" or at an "operational" level. *See, e.g., Miller v. United States,* 583 F.2d 857, 867 (6th Cir.1978). This approach emphasizes the finding in *Dalehite* that the exception applied because "[t]he decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program." 346 U.S. at 42, 73 S.Ct. at 971. Still other courts have endeavored to look both for a "policy judgment" and a "planning level" decision in determining whether the government's action is protected by the discretionary function exception. *See, e.g., Madison v. United States,* 679 F.2d 736, 739 (8th Cir.1982); *Blessing v. United States,* 447 F.Supp. 1160, 1167–86 (E.D.Pa.1978).

The precise issue here presented has been determined by two other courts with conflicting results. In *Stewart v. United States,* 486 F.Supp. 178 (C.D.Ill.1980), the court held that "the decision to sell the asbestos in unmarked crates to knowledgeable buyers involved a weighing of economic and other policy factors and falls within the discretionary function exception." *Id.* at 184. On the other hand, in *Barlieb v. Turner & Newall, Ltd.,* No. 78–1027 (E.D.Pa. Nov. 26, 1980), the court concluded that the decision to sell the asbestos without warnings did not fall within the discretionary function exception. *Id.,* slip op. at 10.[2]

In support of the instant motion, the United States has provided uncontroverted evidence concerning the policy and procedures used by the government in its strategic materials stockpiling program. At the end of World War II Congress determined that it was in the best interests of the United States to stockpile "critical materials being deficient or insufficiently developed [in the United States] to supply the industrial, military, and naval needs of the country for common defense ... in times of national emergency." Strategic and Critical Materials Stock Piling Act of 1946, Pub.L. No. 79–520, 60 Stat. 596 (codified at 50 U.S.C.A. § 98 *et seq.* (1951)) (the Stock Piling Act).[3] The Stock Piling Act also provided for the rotation of materials in the stockpiles and the disposal of excess materials, the latter requiring the express approval of Congress. Pub.L. No. 79–520, § 3(d), (e), 60 Stat. 596, 597–98 (July 23, 1946). Pursuant to this provision, the government often bought strategic materials in times of scarcity, when prices were high, and sold them in times of plenty, when prices were low. *See* Affidavit of John G. Harlan, Jr., U.S. Ex. 1, ¶ 17 at 9 (the Harlan Affidavit). It is not surprising,

---

2. In *Shuman v. United States,* No. 78–1407–S (D.Mass. June 23, 1983), slip op. at 7–9, the court held that the allegations of the complaint were sufficient to withstand a motion to dismiss based on the discretionary function exception, but deferred determination of the applicability of the exception in the case before it until development of a more complete record. The *Shuman* court apparently did not have the benefit of the extensive record presented to this Court in the instant litigation.

3. The Stock Piling Act was completely revised by the Act of July 30, 1979, Pub.L. No. 96–41, 93 Stat. 319 (codified at 50 U.S.C.A. § 98 *et seq.* (Supp.1983)). Relevant portions of the Stock Piling Act remained substantially unchanged from 1946 through 1979, the presently relevant time period.

then, that the Stock Piling Act provided that

> [t]he plan and date of disposition shall be fixed with due regard to the protection of the United States against avoidable loss on the sale or transfer of the material to be released ....

Pub.L. No. 79–520, § 3(e), 60 Stat. 596, 597–98 (July 23, 1946) (codified at 50 U.S.C.A. § 98b(e) (1951)). Stockpiles of asbestos were disposed of pursuant to this authority. *See* Harlan Affidavit ¶ 13. Individual legislation authorizing the sale of particular lots of asbestos repeated the language regarding "avoidable loss." *Id.* at ¶ 18; *see, e.g.,* Pub.L. No. 89–422, 80 Stat. 138 (May 11, 1966).

The General Services Administration (GSA) has been charged with administering the disposal of asbestos since 1949. *See* 50 U.S.C.A. 98b(e) (1951); Exec. Order No. 12,155, sec. 1–102, 44 Fed.Reg. 53,071 (1979), *reprinted in* 50 U.S.C.A. § 98 (Supp.1983).[4] John G. Harlan, Jr., who was a high-level officer in the GSA until his retirement in 1969, and who was connected with the stockpiling programs from 1958 through 1969, relates in his affidavit how the decision to sell each lot of stockpiled asbestos "as is," with no warranties, and without relabeling or repackaging, was arrived at during his tenure:

> The asbestos offered for sale had usually been stockpiled for years. To test, warranty, repackage, or relabel such materials at the time of disposal or to incur avoidable handling ... expenses would have resulted in avoidable cost to the government.... Therefore, the invitation to bids prepared pursuant to my direction and which I approved required that asbestos be sold in the original packaging, with the same markings and in the same condition as it was acquired and stored.
>
> With respect to asbestos, ... we solicited bids only from knowledgeable industry members who regularly used and

handled substantial quantities of [it].... We assumed these buyers would be better qualified than our own storage personnel to properly transport, unpackage, handle and use the material in their manufacturing processes.

Harlan Affidavit ¶ 19 at 11–12. The procedure described by Harlan for the disposal of asbestos continued after his retirement. *See* Affidavit of Readus B. Long, U.S. Ex. 2, ¶ 5 at 3 (the Long Affidavit). It was not until May 1975 that the GSA changed its policy and began placing caution labels on the asbestos bags. *Id.* at 3–4.

■ The record before this Court thus establishes that the decision of the United States to sell asbestos without warnings was deliberately made in order to avoid unnecessary costs in implementation of a congressionally authorized program for the disposal of surplus asbestos. The surplus asbestos was sold "as is," with no warranties, no relabeling and no repackaging in order that the asbestos might be sold with the absolute minimum amount of cost. The asbestos was sold without warnings in the belief that the buyers, all knowledgeable members of the industry, were well aware of the risks of asbestos exposure and could best handle the asbestos. The decision to do so was made by a high-level administrator as part of a plan for disposition of surplus asbestos he established by making policy judgments in accordance with legislative direction. This Court concurs with the *Stewart* court that "[i]n these circumstances, where the Government sells a product to a knowledgeable industry buyer, certainly the decision to sell so as to incur the least cost to the Government, *i.e.,* not to incur the cost of warning an experienced and knowledgeable buyer, was a policy consideration and protected by the discretionary function exception." 486 F.Supp. at 185.

Jurisdiction of Count I is barred by the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a).

---

**4.** From 1946 through 1949 the Bureau of Federal Supply performed this function. *See* 50 U.S.C.A. § 98b, "Historical Note" (1951).

## B. *Count II*

Count II of Third-Party Complaint A is based upon the theory of strict products liability. It seeks noncontractual indemnification and contribution from the United States as a seller of asbestos, which the complaint alleges to be a defective and unreasonably dangerous product. Defendants argue that jurisdiction over this claim also exists under the FTCA. Again, the Court must disagree.

It is well established that the FTCA subjects the government to liability on claims based on negligent or wrongful conduct, but does not extend to claims based on strict liability. *Laird v. Nelms*, 406 U.S. 797, 798, 92 S.Ct. 1899, 1900, 32 L.Ed.2d 499 (1972); *Dalehite v. United States*, 346 U.S. at 44–45, 73 S.Ct. at 972–973. There is no doubt that the Maine statute upon which Count II is based, 14 M.R.S.A. § 221 (1980), is a strict liability statute. *Adams v. Buffalo Forge Co.*, 443 A.2d 932, 934–44 (Me.1982). *See Restatement (Second) of Torts* § 402A (1965) and Comment a. Consequently, Count II does not state a claim over which this Court has jurisdiction under the FTCA.

## C. *Counts III and IV*

In the third and fourth counts of Third-Party Complaint A, defendants seek contractual indemnification from the United States based upon breach of alleged implied warranties. Jurisdiction over these claims is asserted under the Tucker Act, 28 U.S.C. § 1346(a)(2). Neither of these claims, however, satisfies the jurisdictional requirements of the Tucker Act.

*Count III.* Count III alleges that the United States breached an implied warranty that asbestos was safe and reasonably fit for its intended purpose, which arose from the sale of raw asbestos and asbestos-containing products by the United States to certain of the defendants and to BIW.

In relevant part, the Tucker Act vests the district courts with jurisdiction of any "claim against the United States, not exceeding $10,000 in amount,[5] founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). The jurisdiction granted by the Tucker Act with respect to contract claims against the United States extends only to claims arising out of express or implied-in-fact contracts; it does not reach claims on contracts implied in law. *Merritt v. United States*, 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Board of Education v. Bell*, 530 F.Supp. 1130, 1133 (E.D.N.Y.1982). *See also Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 465 n. 5, 100 S.Ct. 647, 650 n. 5, 62 L.Ed.2d 614 (1980).

The distinction between a contract implied in fact, over which there is Tucker Act jurisdiction, and a contract implied in law, over which there is no Tucker Act jurisdiction, is well established. An implied-in-fact contract contains all the necessary elements of a binding agreement, but, since its express terms have not been reduced to writing or stated orally, its provisions must be inferred from the intent and course of conduct of the parties. *See Restatement (Second) of Contracts* §§ 4, 19 (1981); 1 A. Corbin, *Corbin on Contracts* § 19 (1963). An implied-in-law contract, a so-called quasi-contract, is not a contract at all, but a legal fiction which enables a court to fashion an equitable remedy to prevent the unjust enrichment of one party at the expense of another. *Id.*

Defendants allege that at the time of sale, the parties had reached "a tacit understanding that the asbestos in question was reasonably safe from a medical standpoint." Yet defendants fail to point to any evidence that the United States represented that asbestos could be used safely in ship construction. To the contrary, the uncontroverted evidence is that the government sold the asbestos "as is" with an express disclaimer of any warranty, ex-

---

**5.** In order to avoid the Tucker Act's monetary limitation on the jurisdiction of this Court, defendants have limited the damages claimed in each of Counts III and IV to an amount not exceeding $10,000 per plaintiff, plus costs, disbursements and attorneys fees.

press or implied.[6] *See* Harlan Affidavit ¶ 19 at 11; Long Affidavit ¶ 4 at 2–3, and Attachment A, ¶ 2. Thus, it is clear that the type of implied warranty alleged by defendants in Count III, if it exists at all, would have to be one implied in law, since it would in no way depend upon agreement of the parties. *Price Brothers Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 423 (6th Cir.), *cert. denied*, 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981); *Carney v. Sears, Roebuck & Co.*, 309 F.2d 300, 303 (4th Cir.1962). *See* 11 M.R.S.A. § 2–315 (1964). Without any evidence of consent, this Court cannot find a contract implied in fact.

Count III does not state a claim over which this Court has jurisdiction under the Tucker Act.

*Count IV.* In their fourth claim for relief defendants allege that the United States, by promulgating specifications requiring the use of asbestos in connection with the construction and repair of U.S. naval vessels at BIW, impliedly warranted that the asbestos-containing products sold by defendants for use at the shipyard, which conformed in every respect to the specifications, would not endanger the health and safety of shipyard workers. Defendants' theory is that the specifications themselves created a basis for liability of the United States. In support of this proposition defendants cite a line of cases, originating with *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

The *Spearin* line of cases is inapposite to the present litigation. *Spearin* and its progeny support the proposition that under some circumstances detailed government specifications may create an implied warranty that the specifications are adequate to produce the desired product in a satisfactory manner. *See Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 609

F.2d 462, 479 (1979). This warranty, however, extends only to the party in direct privity with the government. Thus, the *Spearin* court awarded damages resulting from faulty specifications to a building contractor who had contracted directly with the government for the construction of a dry dock. Similarly, *Ordnance Research* concerned the liability of the United States to a manufacturer of explosives which entered into a fixed-price contract with the government to prepare an ignition compound according to a formula provided by the government. By providing detailed instructions for the preparation of the compound, the government warranted that the prescribed safety precautions would be adequate to deal with a volatile compound. If such a warranty were found to exist in the present litigation based upon government procurement specifications requiring BIW to use asbestos products in the construction and repair of naval vessels, it would under these cases run not to the defendant manufacturers, but to BIW, the direct government contractor.

The essential flaw in defendants' argument is that in order to assert a viable contract claim against the United States, defendants must establish privity of contract between themselves and the government. *Correlated Development Corp. v. United States*, 214 Ct.Cl. 106, 556 F.2d 515, 523–25 (1977); *Housing Corp. of America v. United States*, 199 Ct.Cl. 705, 468 F.2d 922, 924 (1972); *D.R. Smalley & Sons, Inc. v. United States*, 178 Ct.Cl. 593, 372 F.2d 505, 507–08 (1967). No contract, express or implied, existed between the United States and the manufacturers who supplied asbestos products to BIW. BIW entered into its own contracts with defendants for the purchase of asbestos-containing products. The United States was not a party to those contracts.

---

**6.** Defendants cite *K & M Joint Venture v. Smith Intern., Inc.*, 669 F.2d 1106, 1110 (6th Cir.1982), for its holding that "the use of 'as is' does not automatically exclude implied warranties." That case is plainly inapposite. In that case the parties had agreed that the products would carry full warranties. The court held only that the seller could not change the terms of this express agreement by adding the term "as is" to the sales invoice.

Count IV fails to state a claim which satisfies the jurisdictional requirements of the Tucker Act.[7]

### D. Counts V, VI and VII

In Counts V, VI and VII of Third-Party Complaint A, defendants seek noncontractual indemnification and/or contribution from the United States based upon alleged acts of negligence committed by the United States in its capacity as the owner of naval vessels at BIW (Count VI); as a "Good Samaritan" (Count VII); and as the promulgator of specifications requiring the use of asbestos products at BIW and as the general supervisor of the work at BIW (Count V). Defendants urge that jurisdiction over these claims exists under the FTCA, or, alternatively, that jurisdiction exists over the claims against the United States in its vessel-owning capacity, under the admiralty jurisdiction of the federal courts.[8]

The Court has concluded that the claims for relief asserted by defendants in these counts do not come within the admiralty jurisdiction of this Court. The Court is persuaded, however, that Count VI, but not Counts V and VII, states a cognizable claim under the FTCA.

### (a) Admiralty Jurisdiction

[13] Defendants' contention that admiralty jurisdiction exists over the above claims is foreclosed by the recent decision of the United States Court of Appeals for the First Circuit in *Austin v. Unarco Industries, Inc.*, 705 F.2d 1, 8–14 (1st Cir. 1983). The *Austin* case, like the present cases, involved a suit on behalf of a BIW shipyard employee against a manufacturer of asbestos products sold to BIW. The question of whether admiralty jurisdiction is applicable in shipyard asbestos litigation was comprehensively addressed by Chief Judge Coffin in *Austin*. Applying the two-pronged test announced by the Supreme Court in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), Judge Coffin concluded that admiralty jurisdiction was not invoked by shipyard asbestos cases. *Accord Keene Corp. v. United States*, 700 F.2d 836, 843–45 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Owens-Illinois, Inc. v. United States District Court*, 698 F.2d 967, 969–71 (9th Cir.1983). *But see White v. Johns-Manville Corp.*, 662 F.2d 234, 239–40 (4th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982).[9] Judge Coffin accepted that the plaintiff's claim of being injured while working on a vessel situated in navigable waters—the Kennebec River—met the locality prong of the *Executive Jet* test. But he found that it failed to meet the second prong, which requires that "the wrong bears a significant relationship to traditional maritime activity." *Executive Jet*, 409 U.S. at 268, 93 S.Ct. at 504. In his analysis, Judge Coffin focused on the "activity of the person suffering tortious injury" and concluded that the work performed by an injured shipyard worker is not "traditionally maritime." *Austin*, 705 F.2d at 14.

Even though *Austin* was a direct action by the personal representative of a deceased employee against a manufacturer, and the present motions address third-party claims by the manufacturers against the United States, the analysis so carefully de-

---

7. In Count IV defendants appear also to have based their claim for contractual indemnity on an alleged implied warranty that the United States would use due care in overseeing the use of asbestos products at BIW to ensure the health and safety of the workers. Defendants have not pressed this additional contractual claim in either written or oral argument, and the Court is aware of no principle or precedent for the proposition that these allegations, if proven, would form the basis of a claim of implied contractual indemnity.

8. These alternative jurisdictional bases are mutually exclusive. The FTCA specifically provides that it does not apply to suits in admiralty against the United States. 28 U.S.C. § 2680(d). *See Keene Corp. v. United States*, 700 F.2d 836, 843 n. 11 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).

9. In *Shuman v. United States*, No. 78–1407–S (D.Mass. June 23, 1983), the plaintiff conceded that admiralty jurisdiction did not apply under the principles articulated by the Court of Appeals in *Austin. Id.*, slip op. at 4–5.

veloped by Judge Coffin in *Austin* is directly applicable to these proceedings. *Austin* requires the court to examine the "activity of the person suffering tortious injury" to determine whether admiralty jurisdiction exists. In these cases, as in *Austin*, the BIW employees are the persons alleged to have suffered tortious injury from their exposure to defendants' asbestos-containing products. In light of the conclusion in *Austin* that such persons are not engaged in "traditional maritime activity," *Austin* precludes the invocation of admiralty jurisdiction in the present litigation.[10]

### (b) FTCA Jurisdiction

*Count VI: Alleged Negligence of United States as Vessel Owner.* In Count VI of Third-Party Complaint A, which sounds in negligence, defendants seek noncontractual indemnification and/or contribution from the United States based upon breach of duties allegedly owed to plaintiffs by the United States in its status as the owner of U.S. naval vessels at BIW. In support of this claim, defendants assert that the United States maintained a constant presence at BIW and had firsthand knowledge of unsafe working conditions at the shipyard caused by the use of asbestos materials in the construction and repair of naval vessels at the shipyard, but nevertheless failed to warn the BIW employees working on naval vessels in the Kennebec River about, or otherwise protect them from, the potential dangers of exposure to asbestos.[11] The

theory upon which defendants assert liability of the United States under the FTCA is that plaintiffs in these actions are protected by the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* (LHWCA), and have a right of action under Section 5(b) of that Act, 33 U.S.C. § 905(b), to recover damages from the vessel owner for injury caused by the owner's negligence.[12]

In any action brought under the FTCA, a federal court must apply the "law of the place where the act or omission occurred" (here, Maine), including its choice of law rules. 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 11–13, 82 S.Ct. 585, 591–593, 7 L.Ed.2d 492 (1962); *Hess v. United States*, 361 U.S. 314, 318 n. 7, 80 S.Ct. 341, 345 n. 7, 4 L.Ed.2d 305 (1960). The law is clear that Section 5(b) of the LHWCA provides a covered employee's exclusive remedy against a vessel owner. *Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030, 1032 (5th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978); *Vogelsang v. Western Maryland Railway Co.*, 531 F.Supp. 11, 13 (D.Md.1981), *affirmed*, 670 F.2d 1347 (4th Cir.1982). Thus, in the context of this litigation, the Maine courts would be bound to apply federal maritime law as embodied in Section 5(b) of the LHWCA in determining the merits of a plaintiff's claim against his vessel owner. *See Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 165–66 n. 13, 101 S.Ct. 1614, 1620–21 n. 13,

---

10. Insofar as Counts V and VII allege a duty owed directly to defendants, it might be argued that "the person[s] suffering tortious injury" are the defendants, rather than the employees. The defendants' activities, the manufacture and sale of asbestos-containing products, are hardly "traditionally maritime"; thus *Austin* precludes the invocation of admiralty jurisdiction under this analysis as well. *See Keene Corp. v. United States*, 700 F.2d at 844.

11. Count VI includes additional allegations of negligence by the United States as the promulgator of specifications requiring the use of asbestos products and as the general supervisor of work performed at BIW. These claims are substantially identical to the allegations of Count V, which will be considered in the Court's discussion of that count, *post*.

12. Defendants have also asserted on the same facts that the United States owed plaintiffs duties of care under Maine law in its capacity as the employer of an independent contractor. *See Jenkins v. Banks*, 147 Me. 438, 440, 87 A.2d 908 (1952). *See also Thorne v. United States*, 479 F.2d 804 (9th Cir.1973); *Restatement (Second) of Torts* §§ 413, 414, 416 & 427 (1977). Given the Court's disposition of the Section 5(b) claim, and given that the liability of a vessel owner under Section 5(b) is probably broader than that of a contractor under state law, *see Johnson v. A/S Ivarans Rederi*, 613 F.2d 334, 345–48 (1st Cir.1980), *cert. dismissed*, 449 U.S. 1135, 101 S.Ct. 959, 67 L.Ed.2d 325 (1981), the Court need not reach this alternative argument.

68 L.Ed.2d 1 (1981); *Johnson v. A/S Ivarans Rederi*, 613 F.2d 334, 340 (1st Cir. 1980), *cert. dismissed*, 449 U.S. 1135, 101 S.Ct. 959, 67 L.Ed.2d 325 (1981); *Shuman v. United States*, Civ. No. 78–1407–S (D.Mass. June 23, 1983), slip op. at 3; *Brown v. United States*, Civ. No. H–76–434 (D.Conn. July 23, 1979), slip op. at 5.

■ Section 5(b) of the LHWCA permits a covered employee [13] who is injured "by the negligence of a vessel" to bring an action for damages "against such vessel as a third party." 33 U.S.C. § 905(b).[14] The United States as the owner of the naval vessels upon which the BIW employees worked comes within the definition of the term "vessel" in Section 2(21) of the LHWCA. 33 U.S.C. § 902(21).[15]

■ The United States concedes that even though admiralty jurisdiction does not apply to these cases, the FTCA furnishes a jurisdictional basis for defendants' claim against the United States in its capacity as a vessel owner. *See Shuman v. United States*, slip op. at 5; *Brown v. United States*, slip op. at 5–6 n. 7. *See also Austin v. Unarco Industries, Inc.*, 705 F.2d at

13; *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 273, 99 S.Ct. 2753, 2762, 61 L.Ed.2d 521 (1979). The United States contends, nevertheless, that Count VI fails to state an actionable claim.

The Supreme Court in *Scindia* defined the Section 5(b) duties owed by a vessel owner to an employee of an independent contractor.[16] In *Scindia* the Court reaffirmed its earlier holding in *Federal Marine Terminals, Inc. v. Burnside Shipping Co.*, 394 U.S. 404, 415, 89 S.Ct. 1144, 1150, 22 L.Ed.2d 371 (1969), that the vessel owner owes to such employees "the duty of exercising due care 'under the circumstances.'" 451 U.S. at 166, 101 S.Ct. at 1621. Continuing, the Court stated

> [the] duty extends at least ... to warning the [employer] of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the [employer] in the course of his ... operations and that are not known by the [employer] and would not be obvious to or anticipated by him if reasonably com-

---

13. The LHWCA defines an employee under the Act as

> any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor worker including a ship repairman, shipbuilder, and shipbreaker ....

33 U.S.C. § 902(3). It is undisputed that the BIW employees and deceased employees in these cases were covered by the LHWCA.

14. Section 5(b) of the LHWCA provides in relevant part as follows:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel.

The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b).

15. Section 2(21) of the LHWCA defines the term "vessel" as

> any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crewmember.

33 U.S.C. § 902(21).

16. The LHWCA itself is silent as to the scope of the vessel's liability under Section 5(b), Congress having left that standard of care to be developed by the courts through the "application of accepted principles of tort law and the ordinary process of litigation." *Scindia*, 451 U.S. at 166 n. 13, 101 S.Ct. at 1621 n. 13 (quoting S.Rep. No. 92–1125, 92d Cong., 2d Sess. 11 (1972)).

petent in the performance of his work.... The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the [employer's] operations; and if he fails at least to warn the [employer] of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to [an employee].

451 U.S. at 166–67, 101 S.Ct. at 1621–22 (citations omitted). The Court set forth three tests for determining the liability of a vessel owner: (1) whether the injury was caused by failure of the shipowner to warn of a "hidden danger" on the ship that is known or reasonably should have been known to the shipowner, 451 U.S. at 167, 101 S.Ct. at 1622; (2) whether the injury was caused by conditions under the control of the shipowner, *id.;* (3) whether the injury was caused by failure of the shipowner to intervene when he knows of a dangerous condition and of the employer's failure to correct it, 451 U.S. at 175–78, 101 S.Ct. at 1626–27.[17] *See also Johnson v. A/S Ivarans Rederi,* 613 F.2d at 348; *Ryder v. United States,* 513 F.Supp. 551, 557 (D.Mass.1981).

Defendants allege in Count VI that the United States, as the owner of naval vessels at BIW and as the general supervisor of the work performed on board its vessels, breached its duty to plaintiffs by negligently failing to provide warnings regarding "the latent and hidden perils" posed by the asbestos materials used in the construction and repair of the vessels and by negligently failing to intervene to protect plaintiffs from the risks, of which the United States was aware, posed by exposure to asbestos. Pursuant to the teaching of *Scindia,* these allegations state a cognizable claim under Section 5(b) of the LHWCA. *See Shuman v. United States; Brown v. United States.*

They are sufficient to withstand the United States' motion to dismiss.

 Moreover, the record before the Court at this time raises triable issues of fact regarding the existence and breach by the United States of the duty of due care allegedly owed by it as vessel owner to BIW and its employees. The disputed factual questions which cannot be resolved on this record include: whether the United States knew or should have known of a hidden danger from asbestos exposure which was unknown to the shipyard workers; the degree of active control of the vessels exercised by the United States during the construction and repair operations; whether warnings were in fact given by the United States and, if given, to whom were they given and were they timely and adequate; and, finally, whether, in all the circumstances, the United States exercised reasonable care to protect plaintiffs from the dangers associated with their exposure to asbestos in constructing and repairing U.S. naval vessels. These disputed issues of material fact, as to which the parties have presented conflicting documentary evidence, render summary judgment inappropriate.

As to the claims asserted by defendants in Count VI of Third-Party Complaint A against the United States in its capacity as a vessel owner, the government's motion to dismiss or for summary judgment must be denied.

*Count VII: (Alleged Negligence of the United States as a "Good Samaritan").* In Count VII of Third-Party Complaint A, defendants seek noncontractual indemnification and/or contribution from the United States pursuant to the Good Samaritan doctrine. In support of this claim, defendants allege that by undertaking to conduct studies, surveys and experiments designed to protect the health and safety of asbestos workers, who relied on the United States'

---

**17.** The Court declined to adopt the land-based standards of Sections 343 and 343A of the *Restatement (Second) of Torts* in construing Section 5(b) of the LHWCA. 451 U.S. at 168 n. 14, 101 S.Ct. at 1622 n. 14. Until *Scindia* there had been a split among the circuits as to the applicability of Sections 343 and 343A. *See Ryder v. United States,* 513 F.Supp. 551, 557 n. 10 (D.Mass.1981).

actions to their detriment, the United States assumed a duty to provide warnings and otherwise exercise reasonable care to protect those workers. Defendants further charge that the United States breached its duty of care by failing to provide warnings of, or otherwise to protect the workers from, the hidden dangers of asbestos exposure.

Under the Good Samaritan doctrine, "one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." *Indian Towing Co. v. United States*, 350 U.S. 61, 64–65, 76 S.Ct. 122, 124–125, 100 L.Ed. 48 (1955); *Zabala Clemente v. United States*, 567 F.2d 1140, 1145 (1st Cir.), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); *Restatement (Second) of Torts* §§ 323, 324A (1965). The Good Samaritan doctrine is recognized by federal maritime law. *See, e.g., Indian Towing Co. v. United States; Zabala Clemente v. United States; Patentas v. United States*, 687 F.2d 707, 714 (3d Cir.1982). And, although the Maine courts have not addressed the Good Samaritan doctrine, there is little doubt that they would adopt this generally accepted doctrine as set forth in *Indian Towing* and the *Restatement*.[18] *See Hill v. Day*, 108 Me. 467, 471, 81 A. 581 (1911); *Brawn v. Lyford*, 103 Me. 362, 365, 69 A. 544 (1907).

■ In order to sustain a Good Samaritan claim under *Indian Towing* and the *Restatement*, the defendants in these actions must show: (1) an undertaking by the United States to protect the health and safety of workers coming into contact with asbestos during shipbuilding and repair; (2) negligence of the United States in discharging that undertaking; and (3) one of the following additional elements:

(a) The harm was suffered because of the plaintiffs' reliance upon the United States' undertaking; or

(b) The United States' negligent performance of its undertaking increased the risk of harm to the plaintiffs; or

(c) The United States undertook to perform a duty owed to the plaintiffs by another entity, in this case BIW.

*See generally Indian Towing Co. v. United States*, 350 U.S. at 69, 76 S.Ct. at 126; *Zabala Clemente v. United States*, 567 F.2d at 1145; *Restatement (Second) of Torts* §§ 323, 324A (1965).

■ Defendants allege in Count VII that "by virtue of having undertaken to act and pursue a course of conduct, pursuant to statute, regulation or otherwise, involving the study of the potential dangers, hazards and risks of exposure to asbestos, and further involving efforts to protect the health, safety and welfare of asbestos workers, the USA owed and/or assumed a duty of care to the defendant/third-party plaintiffs and to all asbestos workers, including plaintiffs, who relied upon the USA's actions to their detriment." Count VII further alleges that the United States breached its duty of care by failing to enforce regulations and procedures relating to asbestos exposure and by failing to provide warnings about the potential dangers posed by asbestos products used in the construction and repair of U.S. naval vessels. These allegations sufficiently state the essential elements of a Good Samaritan claim so as to prevent the granting of the United States' motion to dismiss.

■ The United States' motion for summary judgment must, however, be granted. The affidavits and other documentation submitted by the parties disclose no more than that the government conducted studies, surveys and experiments concerning the medical effects of asbestos exposure, issued minimum health and safety requirements to contract shipyards and monitored the shipyards' compliance with

---

18. As defendants point out, the Maine Law Court frequently applies the provisions of the *Restatement* in the absence of controlling precedent when applying the common law of Maine. *See, e.g., Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (1979); *Letellier v. Small*, 400 A.2d 371, 375 (Me.1979); *Nelson v. Maine Times*, 373 A.2d 1221, 1223–25 (Me.1977); *Jones v. Billings*, 289 A.2d 39, 42–43 (Me.1972).

these requirements through the use of on-site Navy inspectors. There is no indication in the record that BIW employees were even aware of or justifiably relied for their safety on these activities of the United States. Such conduct is insufficient as a matter of law to create an affirmative duty of care between the federal government and the employees of an independent contractor. *Ramos Perez v. United States,* 594 F.2d 280, 287–90 (1st Cir.1979); *Zabala Clemente v. United States,* 567 F.2d 1140 (1st Cir.), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); *Kirk v. United States,* 270 F.2d 110, 117–18 (9th Cir.1959). *But see S.A. Empresa de Viacao Aerea Rio Grandense v. United States,* 692 F.2d 1205, 1207–08 (9th Cir. 1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 2084, 77 L.Ed.2d 296 (1983); *United Scottish Insurance v. United States,* 692 F.2d 1209 (9th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 2084, 77 L.Ed.2d 296 (1983). The implementation of various safety control measures, whether pursuant to statute, regulation, or as a matter of policy, does not constitute an undertaking which would oblige the government to insure the safety of all shipyard workers who might benefit from these regulations. While the defendants assert that the actions of the United States were "far more encompassing than mere safety regulations," the type of conduct found in the record fails to establish a direct relationship between the government and asbestos workers such that the United States can be said to have assumed ultimate responsibility for the health of those workers. *See Roberson v. United States,* 382 F.2d 714, 720–21 (9th Cir.1967). On the present record, the government has established that there is "no genuine issue as to any material facts" and that therefore it "is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The United States' motion for summary judgment on Count VII of Third-Party Complaint A must be granted.

■ *Count V: (Alleged Negligence of the United States as Promulgator of Specifications and as General Supervisor of Work at BIW).* In Count V of Third-Party Complaint A, defendants seek non-contractual indemnification from the United States based upon breach of a duty allegedly owed by the United States *directly to defendants* to exercise reasonable care to provide for the safety of workers at BIW and other private shipyards who were engaged in the construction and repair of U.S. naval vessels, to provide warnings to such workers concerning the potential dangers of exposure to asbestos, to promulgate specifications for thermal insulation and other products which were safe and could be used in a safe manner, and to assure that the thermal insulation and other products provided by defendants to BIW and other private shipyards were not used in a fashion which would endanger the health and safety of the shipyard workers.

Defendants contend that the duty allegedly owed by the United States to defendants which underlies the indemnification claim in Count V arose as a result of a "unique relationship" between the United States and defendants in the development of asbestos insulation products for use in the construction and repair of naval vessels. This unique relationship is said to result from the joint endeavors of the United States and the asbestos industry over a period of four decades in developing asbestos-containing thermal insulation products suitable for use by the Navy.

Defendants have cited absolutely no authority for the novel theory of indemnification asserted in Count V, and the Court is not aware of any case law or principle that supports the proposition advanced by defendants in this count. Count V will be dismissed for failure to state a cognizable claim against the United States.

E. *Count VIII*

In Count VIII of Third-Party Complaint A, defendants seek noncontractual indemnification and/or contribution from the United States based upon breach by the United States of a duty allegedly owed to plaintiffs to provide warnings regarding the potential dangers of exposure to tobacco

smoke in general and in conjunction with exposure to products containing asbestos.

Defendants state that Count VIII simply realleges all their prior claims and does no more than expand the scope of the United States' alleged duty to warn to include an obligation to provide information about the synergistic effect of asbestos and tobacco. Because Count VIII includes no substantive allegation which is not incorporated in other counts, Count VIII will be stricken as redundant. *See* Fed.R.Civ.P. 12(f).[19]

### F. *Count IX*

Count IX of Third-Party Complaint A repeats and reiterates all prior claims for relief, and alternatively alleges admiralty jurisdiction as the jurisdictional basis for those claims. Since the Court has concluded that admiralty jurisdiction is not applicable to these cases, Count IX must be dismissed.

## II.

### *Model Third-Party Complaint B: PNS Cases*

Model Third-Party Complaint B also contains nine counts. Each count is virtually identical to the corresponding count in Third-Party Complaint A and the same jurisdictional bases are asserted.[20] The only factual difference between the BIW cases and the PNS cases is that in the former the injured shipyard workers were employed by BIW, a private shipyard, whereas in the latter the injured workers were employed by PNS, a government shipyard. This distinction, however, does not affect the rationale which has led this Court to conclude that Counts I, II, III, V, VII, VIII and IX of Third-Party Complaint A must be dismissed. The government's motion to dis-

miss or for summary judgment on the corresponding counts in Third-Party Complaint B will therefore be granted. Counts IV and VI of Third-Party Complaint B are the only counts requiring further discussion.

### *Count IV.*

 In Count IV of Third-Party Complaint B, defendants allege that the United States, by promulgating specifications requiring the use of asbestos on naval vessels constructed and repaired at PNS, impliedly warranted that the asbestos-containing products sold by defendants for use at the shipyard, which conformed in every respect to the specifications, would not endanger the health and safety of shipyard workers. Defendants' theory is that the specifications themselves create a basis for liability of the United States, of which this Court has jurisdiction under the Tucker Act, 28 U.S.C. § 1346(a)(2). The Court must disagree.

In support of Count IV, defendants rely on *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), and its progeny, including *Ordance Research, Inc. v. United States*, 221 Ct.Cl. 641, 609 F.2d 462 (1979). This line of cases stand for the proposition that "[w]hen the government issues design specifications of a detailed nature ... it warrants the sufficiency and efficacy of those specifications to produce the desired product in a satisfactory manner." *Ordnance Research, Inc. v. United States*, 609 F.2d at 479 (citations omitted). The *Spearin* line of cases addresses government contracts entirely different from those involved in the PNS cases. First, in those cases a private entity was required to comply with detailed govern-

---

**19.** Defendants properly concede that Count VIII does not seek to impose liability on the United States on the basis of the Surgeon General's failure to release information to the general public concerning the increased hazards of combined exposure to asbestos and tobacco smoke. *See, e.g., Gercey v. United States*, 540 F.2d 536, 539 (1st Cir.1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977); *Gelley v. Astra Pharmaceutical Products, Inc.*, 610 F.2d 558, 562–63 (8th Cir.1979).

**20.** The Court notes, however, that defendants have added to the claims asserted in Counts VI and VIII of Third-Party Complaint B an allegation that the United States negligently failed to provide plaintiffs with warnings about the potential dangers of asbestos exposure subsequent to the time that plaintiffs terminated their employment with the government.

ment specifications in performing a contract with the government. In these cases, the entity performing pursuant to the detailed specifications was the government itself, not a private contractor. If any warranty such as that alleged by defendants were found to exist, it could run only from the government to itself. Second, in the PNS cases, the only relationship between defendants and the government arose when the government, as owner of the shipyard, purchased from defendants asbestos products complying with military specifications. It is well established that a vendor/vendee relationship creates no implied agreement by the buyer to indemnify the seller for injuries resulting from the use of the purchased product. *In re General Dynamics Asbestos Products* 539 F.Supp. 1106, 1110–12 (D.Conn.1982); *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714, 723 (2d Cir.1978); *White v. Johns-Manville Corp.*, 662 F.2d 243, 248 (4th Cir.1981).

Count IV fails to state a viable claim under the Tucker Act.

*Count VI*

In Count VI of Third-Party Complaint B, defendants seek noncontractual indemnification and/or contribution from the United States based upon breach of duties allegedly owed to plaintiffs by the United States in its status as the owner of naval vessels at PNS. In support of its motion to dismiss this count, the United States relies heavily on *Austin v. Johns-Manville Sales Corp.*, 508 F.Supp. 313, 315–16 (D.Me.1981), where this Court held that Section 5(a) of the LHWCA, 33 U.S.C.A. § 905(a), barred third-party claims for contribution asserted against BIW by the defendant asbestos manufacturers.

In opposition to the government's motion to dismiss Count VI, defendants argue that this Court's interpretation of Section 5(a) of the LHWCA in *Austin,* is inconsistent with the Supreme Court's recent decision in *Lockheed Aircraft Corp. v. United States,* —— U.S. ——, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983). In *Lockheed* the Court held that third-party claims were not barred by Section 8116(c) of the Federal Employee's

Compensation Act, the language of which is identical to Section 5(a) of the LHWCA. Defendant Raymark Industries, Inc. has filed with this Court a motion for reconsideration of its *Austin* ruling. The motion for reconsideration has been fully briefed and will be assigned for oral argument in the near future. Because of the interrelationship between Raymark's motion for reconsideration of the *Austin* decision and the United States' motion to dismiss Count VI of Third-Party Complaint B, the Court will reserve decision on this aspect of the instant motion. The matter will be assigned for further briefing and oral argument after the Court's disposition of the motion for reconsideration of *Austin.*

III.

*Order*

In accordance with the foregoing, it is

ORDERED as follows:

(1) That the motion of the United States to dismiss, or for summary judgment on, Counts I, II, III, IV, V, VII, VIII and IX of Model Third-Party Complaint A is GRANTED;

(2) That the motion of the United States to dismiss, or for summary judgment on, Count VI of Model Third-Party Complaint A is DENIED.

(3) That the motion of the United States to dismiss, or for summary judgment on, Counts I, II, III, IV, V, VII, VIII and IX of Model Third-Party Complaint B is GRANTED;

(4) That decision is RESERVED on the motion of the United States to dismiss, or for summary judgment on, Count VI of Model Third-Party Complaint B.